Page 22-5442, USA v. Xiaorong You. Oral argument 15 minutes per side. Mr. Klein for the appellant. Good morning, your honors. May it please the court, my name is John Klein and I represent the appellant Xiaorong You, Dr. Xiaorong You. I want to touch on three issues. Of course the court will direct me toward or away from some of them if necessary. The first is the testimony by Dr. Naughton and Mr. Boccio. The second is the knowingly element in sections 1831 and 1832. And the third issue that I want to touch on is the district court's application of intended loss at sentencing. The testimony by Dr. Naughton and by Mr. Boccio has been discussed and analyzed in the briefs at some length. What I want to focus on today briefly is the context in which this trial occurred. Because I think that's important to understand the prejudicial impact of that testimony. The trial of this case took place in April of 2021, which was just a few months after one of the biggest surges in the COVID-19 pandemic. A month before trial, the district court wrote in an opinion that there had been a spike in hate crimes and violence directed at Asian Americans and AAPI people as a result of the COVID-19 pandemic. The former president who had just recently... You said the district court wrote. Was that in this case or in some other opinion? No, that was in this case. In what document? It was in a motion affirming the magistrate judge's exclusion of the government's first expert. I see. Okay, thank you. It's at pages 33, 67, and 68. Okay, thank you. Mr. Klein, you can use your time any way you want, but we're pretty familiar with COVID. I'm confident. We all lived through it, remember? I beg your pardon? We all lived through it, remember? We did. We did. And I simply want to note that this was a time of particular hostility towards Chinese Americans. And as a result of that, it was critical to make sure that none of that potential bias crept into this trial. And it clearly did through the testimony of Dr. Naughton and Mr. Bocio. Let me turn next to the 1831 and 1832 issue. And the issue here is fairly simple. It is whether the knowingly element in those two statutes. Can I go back to just finish up what you were just arguing? The judge offered to give corrective instruction, at least with respect to the portion of the videotape that was played incorrectly, correct? That's right. So what do we do in a situation where something comes up during a trial, the judge recognizes there might be a problem that could be addressed on appeal, so offers to correct it, and the party turns it down? Well, I think very often, Your Honor, a limiting instruction would solve a problem like this. And if a party turned it down, that would be the end of the issue. This was the kind of inflammatory statement for which a limiting instruction would not solve the problem. And, in fact, the trial lawyer turned it down for fear of calling even greater attention to what was a very damaging statement. Well, that's a balancing decision that lawyers make in every case when something happens that they don't like. Was there any discussion about putting a limiting instruction in the final instructions? I don't believe so. I think the discussion of limiting... You really had two choices, or two chances. I think the discussion of limiting instructions occurred when the Bocio testimony was played, and I think that was the last time and the only time it was discussed. But all I would say, Your Honor, is a limiting instruction would not have solved the problem here. And just to be clear, the Bocio testimony at issue is the point at which he's asked why a company wouldn't want a factory in China. And he says, I didn't trust the Chinese. They're very well known to steal the technology. Is that right? That's the critical point within that context. And your point is, once that sentence was played, there automatically had to be a mistrial. To use the phrase, the hackneyed phrase in our brief, the bell couldn't be unrung. The bell could not be unrung. The question then is, does the context of it being a factory in China mean that this Chinese person in the United States can't be trusted? Isn't that really the argument? I mean, we've been talking about the Chinese government throughout the trial, right?  But when you went to China, it's set up with the Chinese government. And isn't that a different context than saying, I don't trust this Chinese person? I don't trust all Chinese persons? Let me draw a distinction that I think this was about Chinese people rather than the Chinese government, what Bocio said. Dr. Naughton testified about Chinese government policies. There's no objection to that. That's appropriate expert testimony. Where Dr. Naughton went wrong, in our view, is when he started talking about the views and the understandings and the knowledge and the attitudes of Chinese scientists or Chinese people. The same is true of Mr. Bocio. He didn't refer to the Chinese government. This wasn't a comment about the Chinese government. His comment was, I don't trust the Chinese. The Chinese, especially they, are very well known to steal the technology. Dr. Yu is an American citizen, but she is of Chinese origin. I think it's impossible to say that this comment didn't apply directly to her. And the same is true, by the way, of Dr. Naughton's testimony, the part we're complaining about. Well, the way this happened, this came up first, I assume, in a motion of limine and the judge thought, I'll exclude it because it might relate to Dr. Yu. And then it comes in inadvertently, and then he says, the judge says that he had reconsidered it. And under these circumstances, in other words, the context of the trial up to that point, under these circumstances Bocio is talking about the Chinese government. So it's almost a factual finding, it seems to me, that the district court made at that stage of the proceeding. So what do we review that for, plain error or what? I think you review it for abuse of discretion. Okay, so it might be wrong, but why is that an abuse of discretion? Because this type of testimony, first of all, when the district judge first ruled on this testimony, this very bit of testimony, the district judge was concerned, appropriately so, that it would be prejudicial. And so the judge excluded it. Later on when it came in by accident, there's no allegation here of intentional conduct by the government, the district judge changed his view apparently and took it as referring to the Chinese government. I think you've got to look at the language. The language didn't change. It was the same language before trial as it was when it was played in front of the jury. And the language was the Chinese. I don't think that can fairly be read as referring to the Chinese government. How long did this trial last? It was, I think, eight or ten trial days. Okay, so we're talking about one phrase in a ten-day trial. Well, we're talking about more than that. We're talking about Dr. Naughton's testimony and then we're talking about Mr. Bocio's comment. And it was a particularly inflammatory comment. Okay. Do you want to go on to your second point? Yes. So turning to knowingly, the knowingly element in 1831 and 1832. Do you mind if I redirect you to do the amount of the loss just so we cover that? Because that's the one I really had a question about. Basically, the argument is the judge should have used profit but used a sales figure multiplied at times the years, and that was the number even though it really reflected sales. Is that the argument? Well, there are two arguments. Argument number one is the keys or argument, the legal argument, which is whether you can consider intended loss at all. And we, of course— You're right. I'm directing you to the second part. I understand. I just don't want to concede anything here. On the second issue, there were a series of assumptions based into the district judge's intended loss calculation, as the district judge himself acknowledged. But the most problematic aspect of it is, I believe, that the starting point— First of all, there are two problematic aspects, and they're closely related. The starting point was $2.9 billion can market or coding market in China. That was drawn from a document, which was the thousand talents application submitted on Dr. Yu's behalf, that the district judge elsewhere found unreliable. So we're starting with an unreliable starting point. But then the district judge traces it through a number of assumptions and comes to a figure of, I think, $121 million or something like that. But the number— That $121 million is 1% of the 60% of the 2.9. That is what happens. Okay. But the 2.9 is a revenue figure, a sales figure. That part I understand, because when— Assuming that everything went well, Dr. Yu and her company would have sold something to can people, correct? Yes. And that something was a physical object that her company would have had to have made, the liquid or the coating or something? It would be a coating, yes. Okay. And so, obviously, her profit would be less than the sale. You sale minus cost of goods. That's what I got in elementary accounting, right? And I am no more knowledgeable about accounting than you are. Isn't that the guts of your argument, that this wasn't— that they were selling something that had a cost and the judge just didn't take it into account at all? That's exactly right. That's exactly right. If you're using Dr. Yu's anticipated profits as a proxy for the loss to the other manufacturers, then you have to look at it in terms of profit and not sales. Because if the other manufacturers— You use the word monopolistic a great deal in his order on this. Was that argued as to what was a monopoly or what meant to be monopolistic in this instance? The evidence, the testimony was that the three main coating manufacturers, which I believe were Sherwin-Williams, PPG, and ExoNobel, essentially controlled the Chinese coatings market. But, again, we're talking about— Okay, but that's all they meant by monopoly. Yes. If you have three competitors, it's usually not a monopoly, but I'll let that pass. The three competitors were the constituents of the market. That's all that's meant. At that point. Okay, that's fine. And that's the coating market in general and not the BPA-free coating market, which was really a new market. That's the 1%. I mean, he gave you, in one sense, a big break because she only thought that she could get 1% of the market in being non-BPA. Well, I think what he said was that 1% of the market total would be non-BPA. Right. She would get it all. Okay. My time is up. I will— Judge Gibbons wishes. Yeah. So, here's a good rebuttal at the right time. Thank you very much. All right. Mr. Palmer. You may proceed. Good morning. May it please the Court. I'll just begin just by taking up before I forget at this point about the monopolistic market. I took the judge to be in that order to be referring to the monopoly that the defendant's company would have with respect to other makers of BPA-free coatings in China, that he made an assumption that once a domestic maker could provide that product, that because of the preference of using a domestic maker, that's where the monopoly would come from. Well, that's not really, you might say, an economic argument. It's a governmental policy argument, that if she entered the market, the Chinese government would see to it that she got all of that relevant market. Is that right? That's how I took it, Your Honor. I'll concede that it's not laid out explicitly. That's most likely, but I just wondered what went on on the ground. Okay. That's fine. Assuming that's right, did the judge mix up sales and profits? It looks like that from the calculation. Yes. I think the judge did use, he did say, we're going to use anticipated profits as a measure. And the calculation that he did go through ended up using the total size of the market as a proxy for the anticipated profits. Sales. Sales. Without expressly discounting for the marginal costs. You're really fighting pretty hard on this. It seems like the easiest thing is just remand it. And if the judge did intend to say there's no marginal cost, which seems unlikely, and yeah, I might have misstated it, but I still think it's $121 million, fine, then we go on. Well, I think in this case it's at least a reasonable proxy within the context of the judge's findings of it being a monopolistic market and that he was otherwise conservative in the sense that he assumed that the BPA-free market wouldn't grow beyond 1%, for example. And that in order for the discount to make any difference with respect to the guidelines level, it would have to go all the way down to $65 million, almost 50%, in order for it to make a difference. And in the context of a monopolistic market and a product in which companies have expended huge amounts of money in researching the technology that goes into it, it's reasonable to assume that discounting by the marginal costs wouldn't have an effect on the district courts. But you do agree that this is a physical object that's going to be sold to people that they're going to smear on their cans, right? Yes. So it takes money to make physical stuff. Yes. Okay, and then the other question here, and obviously I know this doesn't affect the pure law of guideline, but he already gave her a terrific break. That is the way I computed it is he'd have to go down to about $3 million, $3 to $9 million, to cover what he ended up sentencing her to, right? Yes, the district court did. If you do remand, it doesn't seem likely that she's going to get much less. You don't know. He could always look at that, but it's not like we're right on the cusp between two guidelines. Am I right about that? I think that's right, Your Honor. Okay, why don't you go on to other points? If I could just briefly discuss the district court's decision to deny a mistrial. By first emphasizing that when evidence is inadvertently admitted, the favored remedy is for the district court to give a corrective instruction. And in this case, the district court offered to do that, and the defendant declined, which he's entitled to do. But then when the question becomes whether the inadvertently admitted evidence was so prejudicial as to require the drastic remedy of a mistrial, that is a judgment call that's best left to the district court, that this court should only second-guess if it's clearly unreasonable. In this case, the district court reasonably found that in context, the statement referred to the Chinese government. And I'll remind the court that that context was a meeting with a delegation of Chinese government officials. And in common speech, it's not uncommon to use the adjective of the name of a country to refer to that country's government. For example, we might say, the Revolutionary War ended with a treaty with the British. And the district court, who was on the scene, who saw the testimony, who saw its potential effect, if any, on the jury, made the judgment that any prejudice was very, very slight. And that judgment is entitled to this court's deference. I believe your friend told me that the test that we should apply to that decision the district judge made is an abuse of discretion. Do you agree with that? I think that's right, Your Honor. The decision whether to grant a mistrial, it's an abuse of discretion, but it's also a context where the court has recognized that it's an on-scene judgment by the district court who saw what happened. If I could turn briefly, Your Honor, to the intent issue, I think perhaps the most straightforward way for this court to resolve the jury instruction, the defendant's claim that the jury instructions failed to require intent as to every element of the trade secret definition, is to recognize that the instructions that were given substantially covered all of those elements. The instructions required the jury to find that the defendant knowingly possessed information, knowing that it had been stolen or obtained without authorization from the owner, knowing that it was proprietary, meaning that it was exclusive to someone else who had exclusive rights to it, and knowing that the owner treated the information as a secret, and finally, intending to convert that information to her own economic benefit or the economic benefit of someone else, and knowing or intending that that would injure the owner of the information. So all of these scienter requirements effectively covered the trade secret definition, and in particular the elements that the defendant claims were missing, which were the knowledge of the reasonable measures that the companies took to protect their information. In this context, given that the jury was required to find the defendant's knowledge that the company treated or the owners treated the information as a secret, the way that she would know that in the context of this case was that the owners took reasonable measures, in particular nondisclosure agreements. She knew that the information was subject to those agreements. She said in an email to other scientists at Koch that when I discuss compositional information with the companies, no one else can be in the room, and if we didn't abide by those procedures, it would violate the agreements and Koch would be sued. She'd been trained in trade secret procedures. Okay, so with respect to that one, you're saying that treated as secret in the actual instruction is essentially equivalent or would encompass reasonable measures that's in the trade secret definition. Is that a fair statement? Yes. Okay, now then there's a second part of their argument, so what do you do with that? So the second part is the knowledge that the trade secrets have economic value because they're secret, and we think that's covered by the requirement that the defendant intended to convert the information to her own economic benefit, and knowing that doing so would injure the owner. It's hard to see how the defendant could have that intent if she believed that the information didn't have any economic value, and so that is the aspect of the instruction that we think substantially covered that second part of the trade secret definition, and by finding that the instruction is substantially covered, then the court wouldn't need to reach the issue of the tension between this court's prior precedent and the Croomer case and the Supreme Court decisions that follow. If I could briefly address the issue of the intended loss commentary. In determining whether the commentary is a reasonable interpretation of the guidelines term loss, this court looks to the language but also to the context and the structure and the purpose of that language. In this instance, the context and the structure and the purpose show that the guidelines use loss in a specialized sense that reasonably includes intended loss. That context includes the relevant conduct guideline, section 1B1.3, which directs that the offense level should be determined based on the harms that were the result of the defendant's conduct and the harms that were the object of the defendant's conduct, and that guideline makes clear, then, that the offense level should be determined based on both losses that actually occurred and losses that the defendant intended. That's consistent with general criminal law principles, which recognize that the defendant's culpability isn't changed based on the happenstance of whether their conduct is interrupted before the losses can be fully realized. Are you familiar with our case about stealing the Audubon books from the library in Lexington? I don't think I am, Your Honor. The people stole the books, and some of them they got out of the building and went off to New York, but some of them they dropped in the stairway after having stolen the books and they were too heavy, and we held that the loss included those because they intended to take them out of the building. So the guidelines and this Court's precedents have affirmed for decades the use of intended loss. It's true that we have, but apparently there's a Third Circuit case going the other way, and I took a look and I didn't see that the government had gone for cert. Are you familiar with that, or have you looked into that at all? Yes, Your Honor. It seemed as though that court would undermine your position quite strongly, wouldn't necessarily change our mind, but in the great scheme of the world, it seemed pretty damaging to you. I agree with that, Your Honor. Our position is that that decision is wrongly decided and that this Court shouldn't follow it. And it's true that the government didn't seek further review in that case, but in the particular circumstances of that case, as I understand it, the defendant had served the rest of the time, raising potential mootness problems for any further review. Fair point, fair point. But, Your Honor, the reason why we think that the Third Circuit reached the wrong conclusion there is that it focused very narrowly on the dictionary definition of the term loss in the abstract, and it decided that, well, normally when you talk about loss, you mean the loss actually happened, and if you want it to mean losses that were only intended, then you need a modifier in front of it. But the Supreme Court's decision in Kaiser and this Court's decision in Phillips make clear that it's appropriate in doing this analysis to consider the broader context, the broader history, the broader purpose of the guideline. And so the defendant claims that we're relying on just policy arguments and saying why it's important to take into account intended losses and why there would be very disparate outcomes in offense level based on the chance of whether the defendant was, the scheme was interrupted before the losses could be realized. These aren't policy arguments, Your Honor. They are incorporation of the purpose of the guidelines in setting an offense level that corresponds to the defendant's relative culpability. And the context, again, includes that relevant conduct guideline that specifically directs that the offense level should include both harms that were the result of the defendant's conduct and harms that were the object. And in that, putting that context together makes it reasonable for the commission to have promulgated the comment making clear that intended losses are properly considered as they have been since the guidelines were first set up. And if there are no further questions. Thank you. Thank you. Mr. Klein. A few quick points. First of all, Your Honor talked about a remand. We don't know what a remand would show in terms of profit margin. It may be that the margins on this substance, these coatings, is extremely small. It may be that they are so close to breaking even that the loss would be tiny. We just don't know. We just don't know. And I think that's something that the district court, if the court were to remand, would have to explore. Second point. Does it matter to us that you don't even make a representation in the briefs? I'm sorry? Does it matter to us or should it that you don't even make a representation in the briefs that there actually is a significant difference between sales and profits in this industry? There's nothing in the record at all on that. It's totally silent. It did not come up at all in the district court. It would be interesting enough if your client knows, right? If you want me to tell you what my client told me, I'm happy to. No, no, no. I'm not asking you that. Your client knows or has an opinion. I believe she has a good sense. I understand that's not in the record, but it just seems to me it would have enhanced your position to suggest that it might make a difference. Your Honor, I think if we were to have a hearing on this in the district court, it would turn out, based on what I know but what is not in the record, that the margins here are extremely small. All right. Thank you. Judge Boggs, you talked about the break that the district judge gave Dr. Yu, and I think the suggestion was, at least the implication, was that maybe the guidelines error was harmless. And I just want to point you to a couple of things the district judge said that I think points away from that. The district court said that intended loss is a huge, huge issue, the difference between a time-served sentence and the government's recommendation. That's at 7792-93. That intended loss is a very significant issue in the case. It's the difference between a guidelines range that would certainly fall within the range of the time already served by Dr. Yu and a guideline range that approximates 20 years or more. So it's a very, very significant question. That's at 7819. And I know the law is if you get the guideline wrong, you have to remand anyway. I was just indicating how big the break was. But on the other hand, you made a strong representation for only time served. So I think the judge, you know, we don't know what he would or would do. So we'll see if we do. Understood. On the Keysore issue that I think Your Honor touched on, the Third Circuit case is banks. And if this court goes the other way and says that intended loss is properly considered, there will be a clear circuit split with banks? Well, every other circuit has said the same thing. They're already, if I had been the government, the gentleman gave us a reason, if I had been the government, I could have made the split argument wonderfully. Well, I'm not sure that's true, Your Honor. Nobody has said except for Phillips since Keysore? The Ninth Circuit has taken kind of a nuanced position. I think the Fourth Circuit may be considering the issue in bank. The short answer is, Your Honor, I think the effect of Keysore, certainly before Keysore there were hundreds of cases from this court and many others saying intended loss is fine to consider. Since Keysore, I think the law has been in real turmoil. And I think Riccardi from this case is a good example. Well, look, I think the Supreme Court just denied cert in Phillips. I'm not positive, but I thought I saw that. I could be wrong. Oh, in Phillips from this court? Yes. That's Your Honor's opinion. Yes, I think that's right. I was thinking of banks, the Third Circuit case. Judge Gibbons, could I have one more minute? Or I'll stop if you would like me to. I think your time has been allotted on the front end. And you've got a minute left. No, I think I'm over by a minute. Oh, okay. I'm sorry. I missed that. Well, I'd say you better conclude your remarks. All right. Thank you, Your Honor. We appreciate the argument both of you have given. We'll consider the case carefully.